DAKTRONICS, INC. AND SUBSIDIARY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Daktronics, Inc. v. Commissioner
Docket No. 298-88
United States Tax Court
T.C. Memo 1991-60; 1991 Tax Ct. Memo LEXIS 74; 61 T.C.M. (CCH) 1896; T.C.M. (RIA) 91060; February 13, 1991, Filed *74 Decision will be entered under Rule 155. Lewayne M. Erickson, for the petitioner. Douglas W. Hinds, for the respondent. FAY, Judge. FAY
MEMORANDUM OPINION Respondent determined deficiencies in Federal income tax for fiscal years ending April 30, 1983, April 30, 1984 and April 30, 1985 in the amount of $ 84,220, $ 106,417, and $ 141,585, respectively. The issues remaining for decision are as follows: 1. Whether Daktronics, Inc., failed to make a valid application pursuant to section 174 [1] to change its method of treating research and experimental expenditures; 2. alternatively, whether respondent abused his discretion in failing to act upon and grant Daktronics, Inc.'s request pursuant to section 1.9100-1, Income Tax Regs., for an extension of time in which to make a valid application under section 174; and 3. whether respondent abused his discretion in reducing Daktronics, Inc.'s bad debt deduction. *75 The facts have been fully stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. For convenience, the findings of fact have been combined with the opinion. ISSUES 1 & 2: RESEARCH AND EXPERIMENTAL EXPENDITURES Daktronics, Inc. (hereafter petitioner), is a corporation which had its principal office located at 331 32nd Avenue, Brookings, South Dakota, at the time the petition was filed in this case. Prior to and during the years in issue, petitioner was involved in the manufacture, sale, and installation of score boards, voting systems, electronic displays, and control systems for waste water treatment plants. In connection with these business activities, petitioner incurred research and experimental expenditures. For fiscal years ending April 30, 1976, through April 30, 1981, petitioner capitalized these research and experimental expenditures and then amortized them over a five-year period (hereafter the deferred expense method). For fiscal years ending April 30, 1982, through April 30, 1985, petitioner deducted the research and experimental expenditures in the year paid (hereafter the current expense method). *76 This change from the deferred expense method to the current expense method was preceded by a letter dated August 25, 1981, addressed to respondent. The letter was prepared by petitioner's accountant and contained all of the information required under section 1.174-4(b)(2), Income Tax Regs., for requesting a change in the method of treating research and experimental expenditures. Petitioner's president/treasurer signed the letter and designated the letter for mailing. Respondent, however, has no record of receiving the letter, and, as a result, respondent did not issue any correspondence either acknowledging receipt of the letter or approving of the requested change. As later discovered, this letter was never mailed. In October 1982, approximately one year after petitioner's president/treasurer signed and designated the letter for mailing, petitioner submitted a Form 3115 (Application for Change in Accounting Method), requesting a change completely unrelated to the treatment of its research and experimental expenditures. However, in response to question 6 in section A on this Form 3115, which inquires as to whether petitioner had changed the method of accounting of any other *77 item in the past ten years, petitioner disclosed the following: Taxpayer has requested a change in accounting for research and development expenses from capitalizing those expenditures to deducting them in the current year. The application was filed on August 25, 1981. To date, taxpayer has not received a permission letter from the Internal Revenue Service but is acting on the assumption that permission is forthcoming.
Respondent did acknowledge receipt of this Form 3115. However, petitioner later withdrew it from consideration. In February 1988, almost 5-1/2 years after petitioner submitted its Form 3115 containing the disclosure concerning the research and experimental expenditures, some of petitioner's clerical workers were cleaning out old files and discovered petitioner's letter dated August 25, 1981, in an envelope addressed to respondent. Shortly after this discovery, petitioner filed a request pursuant to section 1.9100-1, Income Tax Regs. (hereafter 9100 request), to extend the time fixed by section 1.174-4(b)(2), Income Tax Regs., for filing an application to change from the deferred expense method to the current expense method. The 9100 request sought to *78 extend the time for making an application to change to the current expense method so that petitioner could make a timely application for fiscal year ending April 30, 1983, [2] or in the alternative for fiscal year ending April 30, 1986. On May 26, 1988, approximately one month after petitioner filed its 9100 request, petitioner's accountant discussed the 9100 request with respondent during a telephone conversation. Respondent confirmed this telephone conversation with a letter dated July 1, 1988. In that letter, respondent stated: This refers to an application filed on behalf of Daktronics, Inc. (the taxpayer) for permission to change its method of accounting for deducting research and experimental expenses, for federal income tax purposes, beginning with the taxable year ended April 30, 1988. In a telephone conversation on May 26, 1988, it was stated that the taxpayer wishes to withdraw the request at this time. *79 Accordingly, no further action will be taken, and the matter is considered closed in this office.
There is nothing in the record indicating that either petitioner or petitioner's accountant contacted respondent concerning any misunderstandings or inaccuracies in respondent's letter dated July 1, 1988. Then, approximately five months after respondent's July 1, 1988, letter, petitioner's accountant sent a letter dated December 14, 1988, to respondent confirming the May 26, 1988, telephone call, but in it there was no mention of any discussion concerning withdrawal of the 9100 request. In general, section 174 permits taxpayers to either expense their research and experimental expenditures or capitalize their research and experimental expenditures and amortize them over not less than 60 months. Sec. 174(a) and (b). However, once either of these methods is adopted, it shall be adhered to in all subsequent years unless the Commissioner of Internal Revenue (hereafter Commissioner) approves of a different method. Sec. 174(a)(3), (b)(2). To obtain such approval, a written application for permission to change to a different method must set forth the information required in section *80 1.174-4(b)(2), Income Tax Regs., and it must be filed no later than the end of the first taxable year in which the different method is used. Sec. 1.174-4(b)(2), Income Tax Regs. If permission is granted to make the change, a copy of the permission letter must be attached to the income tax return for the first taxable year in which the different method is effective. Sec. 1.174-4(b)(2), Income Tax Regs. Here, both parties agree that petitioner's application for permission was not filed within the time prescribed, and since no permission letter was ever granted or received, a permission letter was not attached to petitioner's return for fiscal year ending April 30, 1982. Despite these nonconformities, petitioner argues that this Court should find that section 174(b)(2) and the accompanying regulations have been substantially met or waived, or that respondent should be estopped from asserting noncompliance. We decline to make such findings and hold that petitioner cannot change its treatment of research and experimental expenditures without first obtaining respondent's permission. With regard to substantial compliance or waiver, petitioner cites numerous cases where the courts *81 in certain circumstances have held that literal compliance with certain procedural requirements in the statute and regulations is not required. However, these cases deal with certain notification requirements, elections, or agreements. United States v. Van Keppel, 321 F.2d 717 (10th Cir. 1963); Meyer's Estate v. Commissioner, 200 F.2d 592 (5th Cir. 1952); American Air Filter Co. v. Commissioner, 81 T.C. 709 (1983); Tipps v. Commissioner, 74 T.C. 458 (1980); Columbia Iron & Metal Co. v. Commissioner, 61 T.C. 5 (1973); Estate of Fuchs v. Commissioner, 47 T.C. 199 (1966); Cary v. Commissioner, 41 T.C. 214 (1963); V.E. Wagner Well Service, Inc. v. Commissioner, T.C. Memo 1981-391. In this case, by contrast, we must decide whether the statutory requirement of prior approval is a prerequisite to a change in the method of treating research and experimental expenditures. While no case is directly on point, section 446(e), dealing with changes in accounting methods, contains a similar prior approval requirement. Under that section, *82 no change is permitted without prior approval, even where the taxpayer changes from an improper method to a proper method. Witte v. Commissioner, 168 U.S. App. D.C. 133, 513 F.2d 391 (D.C. Cir. 1975); Commissioner v. O. Liquidating Corp., 292 F.2d 225 (3d Cir. 1961). The rationale in this line of cases is that prior approval enables the Commissioner to prevent distortions of income that often accompany changes in accounting methods by conditioning consent on the taxpayer's agreement to make all adjustments. Witte v. Commissioner, supra at 394. We note petitioner argues that in this case all proper adjustments were made. However, that argument misses the point. Permitting taxpayers to less than fully comply with the prior approval requirement in section 174(b)(2), even where the taxpayer made a good faith attempt to request prior approval, jeopardizes the Commissioner's ability to detect necessary adjustments, and, consequently, jeopardizes his ability to protect revenues. For example, if all necessary adjustments had not been made in this case, respondent would have no authority to require adjustments to petitioner's 1982 tax year since *83 the statute of limitations had already run by the time respondent became aware of the change. With regard to whether respondent should be estopped from asserting noncompliance because respondent accepted the change, petitioner cites S. Rossin & Sons, Inc. v. Commissioner, 113 F.2d 652 (2d Cir. 1940), and Fowler Bros. & Cox, Inc. v. Commissioner, 138 F.2d 774 (6th Cir. 1943). However, Rossin and Fowler are distinguishable from this case since they involve situations where the Commissioner was specifically aware of the change. In Rossin, the taxpayer used the reserve method of accounting for bad debts on its first return and on all subsequent returns until year ending April 30, 1929. Then, for year ending April 30, 1929, the taxpayer began using the specific write-off method of accounting for bad debts without filing an application for permission to change methods. Prior to 1936, the year in issue, a revenue agent investigated the taxpayer's return for the year ending April 30, 1929. The revenue agent specifically looked at and approved of the taxpayer's use of the specific write-off method. As a result, the court in Rossin *84 held that the Commissioner is deemed to have given the taxpayer permission to change to the specific write-off method. S. Rossin & Sons, Inc. v. Commissioner, supra at 654. In Fowler, the taxpayer used the accrual method of accounting from 1920 through 1932. From 1933 through 1937, the taxpayer switched to the cash method without requesting or receiving permission from the Commissioner. On its 1937 return, the taxpayer claimed a deduction for services rendered in 1937 but paid in 1938. The taxpayer argued that the deduction was permissible in 1937 because permission was never obtained to change to the cash method, and, therefore, the accrual method must still be used. The court in Fowler held that the taxpayer, by answering questions on its 1933 through 1937 returns, had indicated that it was using the cash method, and since no challenge had been made to the taxpayer's 1933 through 1936 returns, the Commissioner's permission to change was implied. Fowler Bros. & Cox, Inc. v. Commissioner, supra at 775. In this case, respondent was not specifically aware of the change in treatment of petitioner's research and experimental *85 expenditures. Respondent did not examine and approve any post-change year. Moreover, the petitioner did not answer questions on its returns indicating that it was using the current expense method, and all post-change years are in issue, except 1982 due to the fact that the statute of limitations had already run. We do recognize that on petitioner's returns research and experimental expenditures are both expensed and amortized for each year in issue. While this could lead to the conclusion that a change took place, we hold that the mere presence of inconsistent treatment in a return does not result in implied permission for changing the method of treating research and experimental expenditures. To hold otherwise would impose upon respondent too great a burden. Given our holding that section 174(b)(2) and the accompanying regulations have not been substantially met or waived and that respondent is not estopped from asserting noncompliance, we reach the second issue. Here, petitioner argues that respondent abused his discretion in not acting upon and not granting petitioner's 9100 request for an extension of time in which to make an application to change its method of treating *86 research and experimental expenditures. We disagree. With regard to failure to act upon petitioner's 9100 request, it is not clear from the record whether the 9100 request was actually withdrawn. However, respondent believed that to be the case, and respondent so informed petitioner in respondent's letter dated July 1, 1988. In that letter, respondent made reference to an application requesting permission to change petitioner's method of treating research and experimental expenditures beginning April 30, 1988. In fact, petitioner had filed a 9100 request, and it was for April 30, 1983, or alternatively April 30, 1986. Regardless of respondent's reference to April 30, 1988, and respondent's lack of clear terminology, there is no evidence in the record of any other document currently filed with respondent concerning the research and experimental expenditure issue. Moreover, petitioner did not contact respondent concerning any inaccuracies or misunderstandings in respondent's July 1, 1988, letter. While petitioner did inquire into the status of its 9100 request, it was not until five months later, and even then petitioner did not raise any withdrawal concerns. Thus, respondent *87 did not abuse his discretion in failing to act upon petitioner's 9100 request. With regard to not granting petitioner's 9100 request, the Commissioner has discretion, upon a showing of good cause by the taxpayer, to grant a reasonable extension to the time fixed by the regulations for making an application for relief provided: 1. The time for making the application is not expressly prescribed by law; 2. the request for extension is filed with the Commissioner within a period of time the Commissioner considers reasonable under the circumstances; and 3. it is shown to the Commissioner's satisfaction that granting the extension will not jeopardize the Government's interest. Section 1.9100-1(a), Income Tax Regs.
According to the Commissioner, [3] the following five factors generally will be taken into consideration in determining whether good cause has been shown and the other requirements have been met: 1. Due diligence of the taxpayer. 2. Prompt *88 action by the taxpayer. 3. Intent of the taxpayer. 4. Prejudice to the interests of the Government. 5. Statutory and regulatory objectives. With regard to the second factor, we find that petitioner did not take reasonable action to deal promptly with the missed deadline. Section 174(b)(2) and the accompanying regulations clearly require the Commissioner's prior approval. Section 1.174-4(b)(2), Income Tax Regs., requires a permission letter to be attached to the income tax return for the first tax year in which the different method is effective. Moreover, petitioner's tax accountant actually knew of the prior approval requirements as indicated in petitioner's Form 3115 filed October 15, 1982, and, under fundamental agency law, such knowledge is imputed to petitioner. Yet petitioner went ahead and changed its method of treating its research and experimental expenditures without first receiving a permission letter from respondent. Then, almost six years elapsed during which petitioner knew no permission letter was received, and only after audit did petitioner make its 9100 request. That conduct does not constitute prompt action. Petitioner would have this Court rely on a *89 private letter ruling for the proposition that failures by tax advisors are generally not imputed to the taxpayers for purposes of 9100 requests. The private letter ruling petitioner cites is completely unrelated to this case and thus does not add any support to petitioner's position. [4]
In addition, with regard to the fourth factor, petitioner has failed to establish that the granting of its 9100 request would not prejudice the interests of the Government. As stated above, less than full compliance with the prior approval requirement in section 174(b)(2) jeopardizes the Commissioner's ability to detect necessary adjustments, and consequently, jeopardizes his ability to protect revenues. In its brief, petitioner raises a final issue. Petitioner *90 argues that, if it must use the deferred expense method for each year in issue, then it should be permitted to deduct losses under section 165 for research and experimental expenditures that have been capitalized in connection with abandoned projects. We disagree. Even if we overlook the fact that this argument was made late, the record is completely barren of any evidence establishing the abandonment of any projects. ISSUE 3: ADDITIONS TO BAD DEBT RESERVE The following table presents petitioner's bad debt history for the years ending April 30, 1981, through April 30, 1985: Petitioner's Bad Debt History
(3)
(6)
Net
Reserve
(1)
(2)
Charge-Offs
(4)
(5)
Balance
Year-End
Net
Year-End
Additions/
Reserve
Year-End
Year Receivables
Charge-Offs
Receivables
Deductions
Balance
Receivables
4/30/81
$ 780,840  $ 4,820   .62% $ 33,000
$ 37,780
4.84%
4/30/82
759,765
33,479 4.41% 27,000
31,301
4.12%
4/30/83
957,646
(1,058)
(.11%)
40,936
73,295
7.65%
4/30/84
1,109,044
81,628 7.36% 83,333
75,000
6.76%
4/30/85
1,746,027
29,277 1.68% TOTAL
$ 5,353,322
$ 148,146 Based on its accounting firm's analysis *91 concerning the collectibility of each receivable, industry economic conditions, general economic conditions, corporate expansion, and collection slowdowns, petitioner concluded that on April 30, 1985, a reserve balance of $ 85,978 was reasonable. As a result, petitioner made a $ 40,255 addition to its bad debt reserve and took a corresponding $ 40,255 deduction for year ending April 30, 1985. [5] Based on the Black Motor formula, [6] respondent determined petitioner's reserve should only be $ 48,320 [7] and thus issued his notice of deficiency on September 30, 1987. *92 In the notice of deficiency, respondent allowed an addition to petitioner's bad debt reserve and a corresponding deduction of only $ 2,597. [8]
Prior to the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, section 166(c) permitted, at the discretion of the Commissioner, a deduction for a reasonable addition to a bad debt reserve in lieu of deducting specific bad debts which became worthless during a tax year. Whenever the Commissioner challenges the reasonableness of an addition to a bad debt reserve, the taxpayer bears the burden of showing not only that the addition it made was reasonable but that the Commissioner's adjustment to the taxpayer's addition constituted an abuse of discretion. Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 58 L. Ed. 2d 785, 99 S. Ct. 773 (1979); Dixie Furniture Co. v. Commissioner, 390 F.2d 139 (8th Cir. 1968), affg. T.C. Memo 1966-278; Roanoke Vending Exchange, Inc. v. Commissioner, 40 T.C. 735 (1963). Thus, the burden placed on taxpayers under section 166(c) *93 is greater than that needed to overcome the presumption of correctness attaching to the ordinary notice of deficiency. Fairmont Homes, Inc. v. Commissioner, T.C. Memo 1983-209. Petitioner alleges that it has satisfied this heightened burden in that respondent abused his discretion by failing to consider the following factors: 1. Petitioner's operating history was relatively short and no relative consistency had emerged in its bad debt losses; 2. economic conditions were deteriorating; and 3. petitioner's sales volume was increasing. We conclude, however, that petitioner has not met its burden of proof since failing to consider the above factors does not establish that respondent abused his discretion. As a result, we do not reach the question concerning whether the addition petitioner made was reasonable. With regard to the length of petitioner's operating history and inconsistent bad debt history, petitioner cites Westchester Development Co. v. Commissioner, 63 T.C. 198 (1974), and Industrial Credit Co. v. Commissioner, T.C. Memo 1967-75. Petitioner argues that, based on these two cases, respondent abused *94 his discretion in relying solely on the Black Motor formula and thereby neglecting to take into consideration petitioner's brief operating history and inconsistent bad debt history. However, Westchester and Industrial Credit are distinguishable from the facts in this case. In Westchester, business operations commenced in 1966. The years in issue were fiscal year ending February 29, 1968, and fiscal year ending February 28, 1969. Thus, the taxpayer in Westchester had a relatively brief operating history of one to two years, depending on the year in issue. Also in Westchester, the Court specifically found that the taxpayer's obligors were thinly capitalized one-person or family corporations, the principal source of whose working capital was construction loans. As a result, the Court in Westchester held that the use of the Black Motor formula was unwarranted. Westchester Development Co. v. Commissioner, supra at 212. In Industrial Credit, business operations commenced in 1958. The years in issue were calendar years ending December 31, 1960, through December 31, 1962. Thus, the taxpayer had a relatively brief operating history *95 of two to four years, depending on the year in issue. Moreover, the Court in Industrial Credit found that the taxpayer was engaged in a high risk financing business, its nonguaranteed loan percentage had substantially increased, and comparable lending institutions with less risk were allowed a larger percentage for bad debt reserves. As a result, the Court in Industrial Credit held that the Commissioner's determination had been overcome by clear proof and the reduction of the taxpayer's addition to the reserve was unreasonable. Industrial Credit Co. v. Commissioner, supra.
In this case, petitioner has offered no such evidence. Petitioner has a relatively longer operating history of nine years. Moreover, petitioner has not even alleged that it is dealing with high risk obligors or that other comparable companies have been allowed larger percentages for bad debt reserves. With regard to the state of the economy, mere citation of the existence of poor economic conditions is not sufficient to establish that respondent's determination of a bad debt reserve is unreasonable. Valmont Industries, Inc. v. Commissioner, 73 T.C. 1059, *96 1069 (1980); Fairmont Homes, Inc. v. Commissioner, supra. Petitioner's general assertions must be supported by evidence. Petitioner points to the fact that its receivable collections slowed in 1985, and based on its recent history, slower collections translate into larger charge-offs. While petitioner's collections may have slowed in 1985, the pattern petitioner attempts to establish is simply not supported by petitioner's bad debt history. [9] *97 For example, for year ending April 30, 1983, the days' sales in receivables were relatively low, yet the subsequent year's net charge-off percentage was high. Also for year ending April 30, 1982, the days' sales in receivables were high, yet in that year no charge-offs were made. [10] However, even if based on petitioner's recent history, slower collections could be viewed as translating into larger charge-offs, slower collections result in otherwise larger year-end receivables. Thus, the Black Motor formula necessarily incorporates and is directly responsive to slower collections. Finally, with regard to increases in sales volume, absent evidence of a decrease in the quality of receivables, the Black Motor formula is directly responsive to this factor as well. Valmont v. Commisioner, supra at 1069. In this case, petitioner has produced no evidence to establish a decrease in the quality of its receivables. To conclude, petitioner has not demonstrated with clear proof that a 1985 reserve balance as determined under the Black Motor formula would be inadequate to absorb any receivables which may become worthless in the future. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect for the taxable years in issue unless otherwise indicated.↩
2. If granted, this would permit petitioner to use the current expense method for each year in issue.↩
3. See Rev. Proc. 79-63, 1979-2 C.B. 578↩.
4. In addition, we do not read private letter ruling 8912017 so broadly. The Service merely ruled that, on specific facts provided to it, a 9100 request was granted. Moreover, the facts in this case are materially different from the facts in private letter ruling 8912017.↩
5. Petitioner's April 30, 1984, reserve balance of $ 75,000 reduced by net charge-offs of $ 29,277 left $ 45,723. An addition of $ 40,255 was necessary to arrive at a $ 85,978 reserve balance.↩
6. Black Motor Co. v. Commissioner, 41 B.T.A. 300 (1940), affd. on other issues 125 F.2d 977↩ (6th Cir. 1942).
7. The total net charge-offs in column (2) divided by the total year-end receivables in column (1) equals 2.77 percent. This percentage multiplied by 4/30/85 year-end receivables equals $ 48,320.↩
8. Petitioner's April 30, 1984, reserve balance of $ 75,000, reduced by net charge-offs of $ 29,277, left $ 45,723. An addition of $ 2,597 was necessary to arrive at a $ 48,320 reserve balance.↩
9. While days' sales in receivables was not specifically made part of the record, the following chart compares days' sales in receivables with subsequent year's net charge-offs for fiscal years ending April 30, 1980 through 1985: ↩
Subsequent
Year's Net
Charge-offs
Fiscal
Days' Sales
Subsequent Year's
Year-end
Year Ending
in Receivables
Net Charge-offs
Receivables
4/30/80
53
$ 4,820.00 .93% 4/30/81
70
33,479.00 4.29% 4/30/82
59
(1,058.00)
(0.13%)
4/30/83
55
81,628.00 8.52% 4/30/84
56
29,277.00 2.64% 4/30/85
66
N/A     N/A   10. For fiscal year ending April 30, 1982, recoveries were $ 1,058 and charge-offs were zero.↩